# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ERIC JAMES DRUMMOND,        )
         )
        **Plaintiff,**        )
         )    **CIVIL ACTION**
**v.**         )
         )    **No. 11-1286-JWL**
**MICHAEL J. ASTRUE,**        )
**Commissioner of Social Security,**        )
         )
        **Defendant.**        )
_____ )

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Supplemental Security Income (SSI) under sections 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

## I.      Background

Plaintiff applied for both disability insurance benefits (SSD) and SSI, alleging disability beginning April 3, 2008. (R. 9, 141-50). The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (R. 9, 75-78, 102-03). Plaintiff's request for hearing was granted, and

Plaintiff appeared with a non-attorney representative for a hearing before ALJ Michael A. Lehr on August 6, 2008.  (R. 9, 18-74).  At the hearing, testimony was taken from Plaintiff and from a vocational expert.  Id.  Before the ALJ issued his hearing decision, Plaintiff withdrew his request for hearing with regard to the application for SSD.  (R. 9, 301-02).  ALJ Lehr dismissed Plaintiff's request for hearing with regard to the application for SSD, leaving the Commissioner's reconsideration determination and denial as the final decision of the Commissioner with regard to the SSD application.  (R. 9).  Thereafter, he denied Plaintiff's application for SSI benefits in his decision issued August 20, 2010.  (R. 9-17).  Plaintiff sought, but was denied, Appeals Council review of the ALJ's decision.  (R. 1-5).  Therefore, that decision became the final decision of the Commissioner.  (R. 1); Blea v. Barnhart, 466 F.3d 903, 908 (10th Cir. 2006).  Plaintiff timely filed this case, seeking judicial review of the Commissioner's decision.  (Doc. 1).

## II.    Legal Standard

The court's jurisdiction and review are guided by the Act.  Weinberger v. Salfi, 422 U.S. 749, 763 (1975) (citing 42 U.S.C. § 405(g)); Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009) (same); Brandtner v. Dep't of Health and Human Servs., 150 F.3d 1306, 1307 (10th Cir. 1998) (sole jurisdictional basis in social security cases is 42 U.S.C. § 405(g)); see also, 42 U.S.C. § 1383(c)(3) (SSI decision "shall be subject to judicial review as provided in section 405(g)").  Section 405(g) provides for review of a final decision of the Commissioner made after a hearing in which the Plaintiff was a party.  It also provides that in judicial review "[t]he findings of the Commissioner as to any fact, if

supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is such evidence as a reasonable mind might accept to support a conclusion. Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual is under a disability only if that individual can establish that he has a physical or mental impairment which prevents him from engaging in any substantial gainful activity, and which is expected to result in death or to last for a continuous period of at least twelve months. Thompson v. Sullivan, 987 F.2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)); see also, Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (quoting identical definitions of a disabled individual from both 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A)); accord, Lax, 489 F.3d at 1084 (citing 42 U.S.C.

3

§§ 423(d)(1)(A), 1382c(a)(3)(A)).  The claimant's impairments must be of such severity that he is not only unable to perform his past relevant work, but cannot, considering his age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step sequential process to evaluate disability.  20 C.F.R. § 416.920 (2010); Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. § 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--determining whether claimant can perform past relevant work; and whether, considering vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In steps one through four the burden is on claimant to prove a disability that prevents

performance of past relevant work.  Blea, 466 F.3d at 907; accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy within Plaintiff's capability.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

Plaintiff claims the ALJ erroneously evaluated step three of the sequential evaluation process, and erroneously determined RFC at step four of the process.  (Pl. Br. 4-16).  In his step four argument, Plaintiff claims that the ALJ failed to specify from among the twenty areas of functioning identified in the Commissioner's Mental Residual Functional Capacity Assessment form the particular functional limitations which are caused by his mental impairments, id. at 8-11; that the ALJ erred in his credibility evaluation because he misconstrued the evidence and failed to consider the GAF[1] scores assigned which were less than 50,[2] id. at 11-13; and that the ALJ erred in weighing the medical source opinion of Dr. Schwartz.  (Pl. Br. 13-16).  The Commissioner argues that

---

[1]A Global Assessment of Functioning, or GAF, score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. text revision 2000).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 34.  GAF is a classification system providing objective evidence of a degree of mental impairment.  Birnell v. Apfel, 45 F. Supp. 2d 826, 835-36 (D. Kan. 1999) (citing Schmidt v. Callahan, 995 F. Supp. 869, 886, n.13 (N.D. Ill. 1998)).

[2]GAF scores in the range of 41-50 indicate "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV-TR, at 34 (emphasis in original).

the ALJ properly evaluated the credibility of Plaintiff's allegations of symptoms, and is not required to discuss or rely on GAF scores. (Comm'r Br. 8-13). He argues that the ALJ's step three determination that Plaintiff's condition does not meet or equal the severity of a Listed Impairment is supported by substantial evidence and that Plaintiff's brief did not specify which listing he believes he meets. Id. at 13-16. He argues that the ALJ properly evaluated Dr. Schwartz's opinion, id. at 17-20, and that the ALJ's assessment that Plaintiff is limited to simple, unskilled work, and should have no contact with the general public and only occasional contact with co-workers and supervisors is based upon a proper function-by-function assessment and is supported by substantial record evidence. Id. at 20-24.

In his Reply brief, Plaintiff argues that his Brief at pages 4 through 8 "demonstrated how the ALJ's evaluation of Listing 12.04 was neither adequate nor supported by substantial evidence." (Reply 1). In the next seven and one-half pages Plaintiff provides a rather disjointed argument that the ALJ's step three evaluation misunderstood and misconstrued the evidence regarding the severity of Plaintiff's mental impairments. (Reply 1-8). Plaintiff reiterates that at step four of the evaluation process the ALJ failed to perform a function-by-function analysis and to indicate specific functional limitations caused by Plaintiff's mental impairments, that the ALJ's credibility analysis misconstrued the evidence and failed to consider the GAF scores, and that the ALJ erred in evaluating Dr. Schwartz's opinion. Id. at 8-14.

The court finds no error in the Commissioner's decision, and will address the issues presented in the order of the sequential evaluation process.  With regard to the errors Plaintiff alleges occurred "at step 4" (Pl. Br. 8), the court notes that those errors allegedly occurred in the ALJ's erroneous RFC assessment (which takes place in the sequential evaluation process after step three and <u>before</u> step four of the process).  20 C.F.R. § 416.920(e).  Because a proper RFC assessment is based, in part, upon a proper credibility determination and upon a proper evaluation of the medical source opinions, the court will consider the errors Plaintiff alleges in the ALJ's credibility determination and in his evaluation of Dr. Schwartz's opinion before it considers Plaintiff's allegations of error in the ALJ's evaluation of Plaintiff's mental functional limitations.

## III.    Step Three Evaluation

At step two of the sequential evaluation process, the ALJ determined that Plaintiff has bipolar disorder and polysubstance abuse, both of which are severe within the meaning of the Act.  (R. 12).  At step three, he determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in the Listing of Impairments.  (R. 12).  He applied the Commissioner's psychiatric review technique, and determined that plaintiff has experienced no episodes of decompensation of extended duration, but that he has moderate restrictions in activities of daily living, and moderate difficulties both in social functioning and in concentration, persistence, or pace.  <u>Id.</u>  Because he found that Plaintiff has experienced no episodes of decompensation of extended duration, and does not have

"marked" limitations in two of the other three mental functional areas, he determined that the "paragraph B" criteria of Listings 12.04 and 12.09 were not met.  (R. 13).  With regard to the "paragraph C" criteria, he determined they also were not met because:

> There is no evidence that the claimant, despite symptoms or signs currently attenuated by medication or psychosocial support, has an inability to function outside a highly supportive living arrangement, has a residual disease process that would result in decompensation due to even a slight increase in mental demands or change in environment, a history of at least 1 year's inability to function outside a highly supportive environment, or evidence of repeated episodes of decompensation.

Id.  Therefore, the ALJ determined Plaintiff's condition does not meet or equal the criteria of listing 12.04 for bipolar syndrome, or listing 12.09 for polysubstance addiction disorders.  Id. at 12-13.

In his Brief, Plaintiff provides his view of the evidence relied upon by the ALJ in finding only "moderate" limitations in activities of daily living and in concentration, persistence, or pace.  (Pl. Br. 5-7).  He claims the ALJ erred at step three by failing to "explain why some of the forgoing aspects [of the evidence relied upon] and Plaintiff's testimony established only the modest [(moderate?)] limitations he found, and he did not consider at all other aspects of the forgoing that were inconsistent with his conclusion."  (Pl. Br. 5-7).  In the final paragraph of his argument, Plaintiff asserts that with "no analysis at all" the ALJ found Plaintiff had moderate difficulties in social functioning, provided "no rationale explaining how limited Plaintiff was in his ability to interact with co-workers or supervisors," and did not explain how the evidence led to the conclusion that Plaintiff has only moderate difficulties in social functioning.  Id. at 7-8.

8

As noted above, the Commissioner argues that the ALJ's step three determination (that Plaintiff's condition does not meet or equal the severity of a Listed Impairment) is supported by substantial evidence, and that Plaintiff's brief did not specify which listing he believes he meets.  (Comm'r Br. 13).  The Commissioner argues that substantial evidence supports the finding that the "paragraph B" criteria regarding activities of daily living, social functioning, and concentration, persistence, and pace are not met or equaled. Id. at 14-16.  The Commissioner notes that Plaintiff does not challenge the finding that the "paragraph C" criteria of Listing 12.04 are not met, and he argues that substantial evidence supports that finding also.  Id. at 14, n.3.  He concludes his argument, noting that it was "Plaintiff's burden to show that he met or equaled a Listing, and he has not done so."  Id. at 16.

Plaintiff replied, arguing that at pages 4-8 of his Brief he "demonstrated how the ALJ's evaluation of Listing 12.04 was neither adequate nor supported by substantial evidence."  (Reply 1).  Plaintiff argues that the Commissioner did not address the evidence cited by Plaintiff which contradicted the step three finding, but relied on "snippets from the record" allegedly showing improvement or stability in Plaintiff's condition.  Id. at 3-4.

Plaintiff recognized the Commissioner's argument--that the ALJ stated he had considered the entire record and that it was Plaintiff's burden to prove that the ALJ did not do so.  Id. at 5.  In response, he argues that it is not his burden to show that the facts contrary to the ALJ's opinion were not considered by the ALJ, but that "[i]t is the ALJ's

obligation to present a rationale that does not misrepresent the facts and does not present a one-sided version of the facts designed to suit his conclusion." Id.  He argues, "If the agency can respond that the ALJ's consideration was covered in his 'considered the entire record' boilerplate, [then] whether [the ALJ] considered the 'other aspects' [of the evidence relied upon] is impervious to review.  Not answered by the agency is how the ALJ could have reached his conclusion in spite of the record as a whole." Id. at 5-6.

In his reply, Plaintiff also argues that the ALJ did not properly explain the rationale for his findings, did not properly or adequately characterize the facts regarding Plaintiff's activities or condition, and provided excessive weight to certain factors while providing inadequate weight to other factors in his step three analysis, and that the Commissioner's Response Brief merely repeated the erroneous findings of the ALJ. (Reply 6-8).

### A.      The Standard for a Step Three Determination

The Commissioner has provided a "Listing of Impairments" which describes certain impairments that he considers disabling.  20 C.F.R. § 416.925(a) (2010); see also, Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If plaintiff's condition meets or equals the severity of a listed impairment, Plaintiff is conclusively presumed disabled. Williams, 844 F.2d at 751; see also Bowen v. Yuckert, 482 U.S. 137, 141 (1987) (if a claimant's impairment "meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled").  However, plaintiff "has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet all of the

10

specified medical criteria' contained in a particular listing." <u>Riddle v. Halter</u>, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in <u>Zebley</u>)). "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing. <u>Zebley</u>, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'" <u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)). The listings "streamlin[e] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." <u>Yuckert</u>, 482 U.S. at 153. "Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively." <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

**B.**     **Analysis**

As the Commissioner points out, Plaintiff did not specify which Listing he believes he meets or medically equals. Although Plaintiff's reply brief asserts that his brief demonstrated how the ALJ's evaluation of Listing 12.04 was inadequate and unsupported, neither his brief nor his reply say anything about meeting or medically equaling Listing 12.04--or any other Listing. Plaintiff's brief suggests that the ALJ erred

in finding only moderate limitations in activities of daily living, in social functioning, and in concentration, persistence, and pace.  He claims the ALJ erred at step three by failing to explain his findings, and by not considering the facts that were inconsistent with his conclusion.  He asserts that the ALJ provided no analysis and no rationale for his findings, and did not explain how the evidence led to his conclusion that Plaintiff has only moderate difficulties in social functioning.

Even assuming that Plaintiff's allegations are correct, that the ALJ failed to provide adequate analysis or explanation regarding his step three finding and that the finding is unsupported, Plaintiff has not alleged that he was prejudiced by the error, because he does not say what Listing, if any, his condition meets or medically equals.  In fact, he does not argue that his condition meets or medically equals any listing.  He alleges that the ALJ incorrectly evaluated the criteria of Listing 12.04, but he does not point to criteria of that Listing (or any other) which were met or equaled.  The burden of proof at step three is on Plaintiff, and to be found disabled at that step, he must demonstrate that his impairments meet all of the criteria of a particular listing.  Riddle, 2001 WL 282344 at *1; see also Zebley, 493 U.S. at 530.  He has not done so.

Perhaps Plaintiff is arguing that remand is necessary because failure to adequately analyze, explain, or support the step three finding is a failure to follow the correct legal standard, requiring remand even if Plaintiff is not prejudiced by the error, or even if Plaintiff's condition does not meet or equal the severity of a Listing.  However, Plaintiff does not cite legal authority requiring remand for "legal error per se" such as he suggests,

and the court is aware of no such doctrine.  Moreover, The Tenth Circuit has held that a court will not remand a Social Security case solely to require a ministerial correction. Wilson v. Sullivan, No. 90-5061, 1991 WL 35284, *2 (10th Cir. Feb. 28, 1991).  Plaintiff does not allege that his condition meets or medically equals a Listing, he does not point to specific evidence demonstrating that his condition meets or medically equals the criteria of a Listing, and he has not shown prejudice resulting from the allegedly inadequate step three analysis and explanation.  Plaintiff has shown no error at step three.

**IV.    Credibility Determination**

Plaintiff claims the ALJ erred in his credibility evaluation because he misinterpreted the medical evidence upon which he relied to find improvement in Plaintiff's condition, he did not consider GAF scores below 50 which must be considered, and he inappropriately relied upon Plaintiff's statements both that he would start looking for work if he were not approved for SSI benefits, and that he feels like he can work when he takes his medication.  The Commissioner argues that the ALJ properly evaluated the credibility of Plaintiff's allegations.  He argues that the ALJ properly determined that Plaintiff's condition improved after his hospitalization in 2008, that the ALJ is not required to discuss or rely on GAF scores, and that the ALJ is entitled to consider and rely on Plaintiff's statements regarding his willingness and ability to work.  The court agrees with the Commissioner's arguments.

**A.     The ALJ's Credibility Analysis**

The ALJ explained his credibility determination:

13

The claimant alleges he is unable to work due to his psychiatric impairment, but the claimant's treatment notes do not support the degree of limitation alleged by the claimant. The claimant restarted mental health treatment in March 2008. (Exhibit 4F [(R. 369-88)]). While the claimant required inpatient hospitalization at that time, treatment notes reflect improvement with medications and therapy. (Exhibit 4F at pp. 17-19, Exhibit 7F at p. 3, Exhibit 11F [(R. 385-87, 406, 412-15)]). In fact, the claimant reported to his treatment providers he would start looking for work if he was not approved for Supplemental Security Income. (Exhibit 7F at p. 3 [(R. 406)]). Despite this improvement, the claimant did not continue with this treatment, but testified he continues to take medications. (Exhibit 11F at p. 3 [(R. 412)]). These findings certainly establish the claimant's medically determinable impairments, but do not support the degree of limitation alleged by the claimant.

(R. 14). The ALJ later noted that "[t]he claimant reported to Dr. Schwartz that he feels like he can work when he takes his medications." Id.

## B. Analysis

An ALJ's credibility determinations are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173. Therefore, in reviewing the ALJ's credibility determinations, the court will usually defer to the ALJ on matters involving witness credibility. Glass v. Shalala, 43 F.3d 1392, 1395 (10th Cir. 1994); but see Thompson, 987 F.2d at 1490 ("deference is not an absolute rule"). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Wilson, 602 F.3d at 1144

(quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988)); Hackett, 395 F.3d at

1173 (same).

      Plaintiff must demonstrate the error in the ALJ's credibility rationale or finding.

The mere fact that there is evidence which might support a contrary finding will not

establish error in the ALJ's determination.  "The possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's findings from

being supported by substantial evidence.  We may not displace the agency's choice

between two fairly conflicting views, even though the court would justifiably have made

a different choice had the matter been before it de novo."  Lax, 489 F.3d at 1084

(citations, quotations, and brackets omitted); see also, Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966).  Therefore, where the ALJ has reached a reasonable conclusion

that is supported by substantial evidence in the record, the court will not reweigh the

evidence and reject that conclusion even if it might have reached a contrary conclusion in

the first instance.

      Here, Plaintiff seeks to have the court reweigh the evidence regarding credibility.

However, the ALJ's summary of the evidence is reasonable and supported by the record.

As the ALJ noted, Plaintiff had a psychiatric hospitalization in March 2008.  (R. 385).

However, on April 7, 2008, Plaintiff was feeling more energy, was "doing better," had

"resumed playing his guitar," was interested in being a cook, expressed an interest in

joining the military to learn that skill, and the therapist "urged him" to pursue that

interest.  (R. 387).  The therapist urged Plaintiff to exercise, and Plaintiff agreed to try

15

walking a mile a day.  Id.  On April 21, 2008, Plaintiff noted "more energy 3 days out of

7," stated he "started dating and was considering getting a job," and was "exercising

daily, jogging or walking a mile or two."  (R. 386).  At a medication check with

Plaintiff's psychiatrist, Dr. Jerkovich, on June 3, 2008, the record reveals:  "The patient

states he is less depressed.  He is more animated and more active.  There is no suicidality.

He is, however, not working at this point.  He has applied for SSI.  If he is turned down,

he will start looking for work."  (R. 406).  Dr. Jerkovich's note dated August 18, 2008

reveals, "The patient states he is bored and attempting to get back into the work place.  I

encouraged him in this quest."  (R. 415).  On September 29, 2008, Plaintiff was "doing

well," and reported no "marked difficulties."  (R. 414).  On November 17, 2008 he

reported his "medication is helpful and keeps him from being depressed or excessively

angry."  (R. 413).  Four months later, on March 18, 2009, Plaintiff was discharged from

Dr. Jerkovich's treatment, and the reason was given as "Treatment Not Completed, Client

Decision (AMA,[3] No Show), Unable to locate client."  (R. 412).

The ALJ's summary is a fair representation of the facts as revealed in the record.

He specifically noted that Plaintiff did not continue treatment, but it is noteworthy that he

stated that Plaintiff "testified he continues to take medications."  (R. 14); see also, (R. 27)

(Plaintiff testified he is taking Seroquel, Celexa); (R. 36) (Plaintiff testified he is not

---

[3]Presumably "against medical advice."  Merriam-Webster's Medical Dictionary,
New Edition, 25 (2006) ("abbr 1 against medical advice  2 American Medical
Association"); but see, Stedman's Medical Dictionary, 53 (27th Ed. 2000) ("AMA.
Abbreviation for American Medical Association.")

currently going to mental health center because he doesn't feel like he needs it, and "[t]he medicines seems [sic] to be helping."). Plaintiff's argument primarily suggests that the ALJ should have given less weight to Plaintiff's improvement after his hospitalization, and to the suggestion that Plaintiff could work, and greater weight to the facts of his hospitalization and the fact that he stopped treatment "AMA." However, the ALJ acknowledged each of these facts.

Moreover, Plaintiff's characterization is not the only reasonable understanding of the facts. For example, Plaintiff asserts that Dr. Jerkovich's notes show that he left treatment against medical advice. However, Dr. Jerkovich's note as quoted above reveals it is as likely that Plaintiff was a "No Show" as it is that he quit "AMA." (R. 412) ("Client Decision (AMA, No Show)"). Further, Plaintiff suggests that before he was admitted to the hospital "[h]e was lying on train tracks." (Pl. Br. 12) (without citation). While there is evidence suggesting that was the case (R. 381) ("was laying [sic] on train tracks"); (R. 384) ("Prior to this admission he was laying [sic] in front of railroad tracks."), his hospitalization was characterized as "Voluntary" (R. 385), and the therapy notes on March 27, 2008 state, "Most recently he had <u>thoughts</u> of laying [sic] on the train track." (R. 372) (emphasis added). The hospital record dated at his admission on March 19, 2008 records "suicidal <u>ideation</u>" both in the "Physical Exam' section and the "Faculty Note" section (R. 345) (emphasis added), and the "History of Present Illness" states, "<u>Thoughts</u> of Suicide Laying [sic] in front of Train." (R. 346) (emphasis added). It is by no means clear that Plaintiff actually lay on the train track at any time before he was

admitted to the hospital in March, 2008.  And, Plaintiff makes little attempt to demonstrate why this fact requires finding that his allegations of disabling symptoms are credible, since he was treated and released from the hospital, and treatment notes indicate that his condition had improved, and suggest that he could work.

Plaintiff also argues that in making his credibility determination, the ALJ did not consider the GAF score of 40 assigned when Plaintiff was hospitalized, the GAF score of 48 assigned by Dr. Jerkovich when treatment was terminated, or the GAF score of 45 assigned by Dr. Schwartz at his examination.  Relying on unpublished opinions of the Tenth Circuit and of this court, Plaintiff argues it is error for the ALJ to fail to consider these GAF scores.  (Pl. Br. 12) (citing Givens v. Astrue, 251 F.App'x 561, 567 (10th Cir. 2007); and Wright v. Barnhart, No. 01-1312-MLB, slip op. at 11 (D. Kan. June 27, 2002) (Report and Recommendation).  The Commissioner argues that an ALJ is not required to discuss or rely on GAF scores, that a low GAF score is merely one piece of evidence to be considered with the rest of the record evidence, and that a GAF score without further narrative explanation provides little support to a conclusion that mental impairments seriously limit the Plaintiff.  (Comm'r Br. 10-11) (citing 65 Fed. Reg. 50,746, 50,764-65, 2000 WL 1173632 (Aug. 21, 2000); Zachary v. Barnhart, No. 03-7032, 94 F.App'x 817, 819, 2004 WL 790300, *2 (10th Cir. Apr. 14, 2004); Petree v. Astrue, No. 07-5087, 260 F.App'x 33, 42, 2007 WL 4554293, *8 (10th Cir. Dec. 28, 2007); Eden v. Barnhart, No. 04-7019, 109 F.App'x 311, 314, 2004 WL 2051382 (10th Cir. Sept. 15, 2004); and

Holcomb v. Astrue, No. 09-5167, 389 F.App'x 757, 759-60, 2010 WL 2881530, *2 (10th Cir. July 22, 2010).

As the Commissioner notes, in revising the Mental Impairment Listings in August 2000 the Commissioner explained his decision not to discuss the GAF scale in subparagraph 12.00D (Documentation) of the those listings.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (August 21, 2000).  In his explanation, the Commissioner noted that two commenters recommended discussing the GAF scale in Subparagraph 12.00D.  Id. at 50,764.  He explained that the GAF scale "is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association," but that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings."  Id. at 50,764-65.  This explanation expresses the Commissioner's finding that a GAF score does not directly correlate to the criteria in the Listings.  Therefore, a GAF score, by itself, does not suggest the severity of a claimant's impairments under the regulations, and does not directly support or detract from the credibility of the claimant's allegations of symptoms resulting from his impairments.

The court notes that the cases cited by both Plaintiff and the Commissioner are unpublished decisions and are not controlling precedent in this case.  The court in Givens noted that the ALJ's conclusion regarding mental impairments found little support in the record, that the ALJ's decision gave no evidentiary reason for his conclusions, and that the only medical opinion supporting the ALJ's conclusion was a Psychiatric Review

Technique form that the court found unsupported by medical evidence.  <u>Givens</u>, 251

F.App'x at 567.  It noted that the evidence "flatly contradicts" the ALJ's statement that

there was no evidence of decompensation in the record, and found to the contrary that the

evidence indicates that Ms. Givens' "mental impairments are anything but mild."  <u>Id.</u>  It

found that the ALJ gave only cursory consideration to this evidence and gave no reason

for rejecting it.  <u>Id.</u>  It then discussed a GAF score appearing in the record:

> In particular, Ms. Givens' treating physician assigned her a GAF score of
> 50.  The ALJ gave no reason for rejecting this assessment.  The VE stated at
> the hearing that a person with a GAF score of 50 would have difficulty
> maintaining employment.  Nowhere in his decision did the ALJ consider the
> effect of this difficulty on Ms. Given's ability to work.  Nor did he analyze
> the GAF score as the opinion of a <u>treating physician</u> as required by the
> regulations and our case law.

<u>Givens</u>, 251 F.App'x at 567 (emphasis added).

In <u>Wright</u>, a Social Security case in this district, the Commissioner filed a Motion

to Remand in response to Plaintiff's Social Security Brief, and Plaintiff filed a reply,

requesting remand with an immediate award of benefits.  <u>Wright</u>, No. 01-1312-MLB, <u>slip</u>

<u>op.</u> at 1.  The court found that remand was necessary, but that an immediate award of

benefits was not appropriate because on remand it would be necessary for the

Commissioner "to determine if any of plaintiff's past work qualifies as past relevant work,

and if so, whether plaintiff's limitation to working 4 hours a day for 5 days a week would

permit her to perform any of her past relevant work."  <u>Id.</u>, <u>slip op.</u> at 10.  It was only

thereafter that the court noted that the record contained GAF scores of 45, 50-55, and 40,

and stated that it was error for the ALJ not to consider these scores.  <u>Id.</u>, <u>slip op.</u> at 11

20

(citing <u>Chester v. Apfel</u>, 1999 WL 360176, *4 (10th Cir. June 4, 1999) ("Because the

ALJ's discussion of Dr. McCarthy's opinion does not mention the GAF score of thirty,[4]

which does indicate a severe impairment, it is unclear whether the ALJ considered this

aspect of the report, or rejected this evidence, favorable to claimant's position, without

discussion.  On remand ... we direct the Commissioner to reconsider the evidence of

claimant's mental impairments and to include an evaluation and discussion of Dr.

McCarthy's GAF score")).  Before the court in <u>Wright</u> considered the GAF scores, it had

already decided that remand was necessary but that an immediate award of benefits was

not appropriate.  Then, it discussed the GAF scores at issue.  That discussion was not

necessary to the court's decision, and as such, is merely dicta without persuasive force in

this case.

As the Commissioner's brief suggests, the <u>Zachary</u> court held that a GAF score

alone and without explanation is unhelpful in deciding the severity of a claimant's

impairments.  <u>Zachary</u>, 94 F.App'x at 819 ("Dr. Mynatt's finding that Ms. Zachary's

present level of functioning was 45 did not include any explanation for giving her that

rating and did not indicate that Ms. Zachary was unable to work.  Ms. Zachary's GAF

score of 45 may indicate problems not necessarily related to her ability to hold a job, and

---

[4]GAF scores in the range of 21-30 indicate "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends).  DSM-IV-TR, at 34 (emphasis in original).

therefore standing alone, without any further narrative explanation, this rating does not

support an impairment seriously interfering with her ability to work.") (citation omitted);

see also, Eden, 109 F.App'x 311, 314.

The Petree court noted that a GAF score is not a one-time, unchanging measure. It

noted previous GAF scores of 20-30 and 55-60, and that Plaintiff's scores had fluctuated

over time. It held that a low GAF score is merely a piece of evidence to be considered in

the record. Petree, 260 F.App'x 33, 41-42. In Holcomb, the court stated that a GAF

score may be helpful, but it is not essential, and that taken alone it does not establish

inability to work. It noted that the ALJ had failed to analyze four GAF scores in the

range from 43 to 50 assigned by a Licensed Professional Counselor and a Licensed

Clinical Social Worker, but that those caregivers were not acceptable medical sources

within the meaning of the regulations. It also noted that a nontreating examiner (an

acceptable medical source) had assigned a GAF score of 51-55, and found that the GAF

scores assigned by the LPC and the LCSW were not uncontroverted evidence, and need

not be discussed by the ALJ. Holcomb, 389 F.App'x 757, 759-60 (citing Clifton v.

Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)).

The court believes the correct approach is best summed up in another unpublished

opinion cited by neither party:

> Standing alone, a low GAF score does not necessarily evidence an
> impairment seriously interfering with a claimant's ability to work. Eden v.
> Barnhart, 109 F.App'x. 311, 314 (10th Cir. 2004) (unpublished). The
> claimant's impairment, for example, might lie solely within the social,
> rather than the occupational, sphere.

Lee v. Barnhart, 117 F.App'x. 674, 678 (10th Cir. 2004).  The Lee court went on to note

that "[a] GAF score of fifty or less, however, does suggest an inability to keep a job."  Id.

(citing Oslin v. Barnhart, 69 F.App'x. 942, 947 (10th Cir. 2003)).  It concluded that in a

case decided at step two (finding the claimant's impairments are not severe, or do not

have more than a minimal effect on his ability to perform basic work activities), a GAF

score of 50 or below should not be ignored.  Id.  The rule in Lee can be understood in

light of the fact that a case decided at step two involves finding that the claimant's

impairment(s) do(es) not have more than a minimal effect on his ability to perform basic

work activities, whereas a GAF score of 50 or below suggests an inability to work.  Such

an inconsistency must be explained.

　　　The principles to be garnered from these authorities are that GAF scores do not

directly correlate to the severity criteria used by the Social Security Administration, and

that GAF scores are a part of the record evidence which must be considered by the

Commissioner in light of the facts and circumstances of the particular case at issue.  In

considering the probative value of GAF scores in the circumstances, it must be

remembered that a GAF score without a narrative explanation from the source of the

score is of little value in determining the severity of the claimant's impairments or the

limitations resulting from his impairments.  In general, the better and more thorough the

narrative explanation given for the GAF score, the greater the consideration it must be

given, and the greater the need for discussion in the decision.  Where record evidence (the

GAF score) is inconsistent on its face with the ALJ's findings, that inconsistency must be resolved.

Applying these principles here, the GAF score of 40 assigned on admission to the hospital in March 2008 includes a clinical summary stating that Plaintiff had suicidal depression, attempted suicide by overdose in 2006, was lying in front of railroad tracks, had some avoidant behavior, and only attended one outpatient appointment after his 2006 hospitalization. (R. 384). While this record reveals a narrative explanation for the GAF score assigned, the score and its explanation relates to his condition on admission, and as discussed above, the record reveals that Plaintiff was released from the hospital and attended therapy for several months thereafter, during which he was described as improving and it was suggested that he was able to work. Plaintiff shows no reason this GAF score must be discussed in the decision, and no unexplained inconsistency between this score and the ALJ's findings. The GAF score of 48 assessed by Dr. Jerkovich in March 2009 after Plaintiff failed to complete treatment is a "bare" GAF score without any explanation whatsoever, and consequently there is no need to discuss that score in the decision at issue. (R. 412).

Finally, Plaintiff points to the GAF score of 45 assessed by Dr. Schwartz in his examination report. Although Dr. Schwartz did not provide a narrative explanation for the GAF score assessed, he stated his opinion that Plaintiff cannot "cope with the stress of a competitive work environment." (R. 429). Therefore, one might reasonably conclude that the GAF score relates to limitations in Plaintiff's ability to perform work-related

24

activities.  However, the ALJ specifically rejected this portion of Dr. Schwartz's opinion and found that "the claimant would be able to handle the stress of competitive employment."  (R. 14).  Having rejected the basis for Dr. Schwartz's GAF score, the ALJ had no reason to further discuss and reject the score itself.  If the ALJ's evaluation of Dr. Schwartz's opinion was erroneous, the failure to discuss the GAF score was also erroneous.  Therefore, the issue is whether the ALJ erred in evaluating Dr. Schwartz's opinion.  Plaintiff has shown no error in the credibility determination, and the court will now address the errors alleged in the ALJ's evaluation of Dr. Schwartz's opinion.

## IV.    Evaluation of Dr. Schwartz's Opinion

Plaintiff claims the ALJ erred in evaluating Dr. Schwartz's medical opinion.  He argues that the ALJ mischaracterized Dr. Schwartz's opinion (that Plaintiff could not cope with work stress) as "speculation" merely because he did not agree with it, and that the ALJ did not explain or support his conclusion regarding "minimal findings."  (Pl. Br. 14).  Plaintiff argues that Dr. Schwartz was the medical expert hired and qualified "to offer an opinion about Plaintiff's ability to function in the presence of the stress of the competitive work environment."  Id.  He argues that the ALJ misconstrued Dr. Schwartz's opinion in order to "concur" with him that "claimant is limited to simple, unskilled work."  Id.  He argues that in relying on Plaintiff's testimony that he could work, the ALJ "favor[ed] the psychiatric judgment of a mentally ill individual over that of the psychologist who understood Plaintiff's claim that he could work in the context of his Bipolar I diagnosis," and thereby the ALJ "second guess[ed] Dr. Schwartz with his own

25

evacuation [(evaluation?)] of the medical data." Id. at 15 (citing Miranda v. Barnhart,

205 F.App'x 638, 641 (10th Cir. Aug. 11, 2005).  He argues that the ALJ picked and

chose the parts of Dr. Schwartz's opinion favorable to his decision.  Id. at 15.

The Commissioner argues that the ALJ properly weighed the medical opinions.

(Comm'r Br. 17).  He argues that the ALJ summarized the opinions at some length and

stated the weight accorded to Dr. Schwartz's opinion and the reasons for that weight, and

that substantial record evidence supports those reasons.  Id.  The Commissioner argues

that the Plaintiff made many statements regarding his ability to work, and the ALJ was

justified in relying on those statements.  Id. at 18.  He argues that it is the ALJ's duty to

resolve conflicts in the evidence, and he did so without merely picking and choosing from

Dr. Schwartz's opinion.  Id. at 19.

### A.      Standard for Evaluating Nontreating Source Opinions

"Medical opinions are statements from physicians and psychologists or other

acceptable medical sources that reflect judgments about the nature and severity of [a

claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis."

20 C.F.R. § 416.927(a)(2).  Opinions from any medical source must not be ignored, and

will be evaluated by the Commissioner in accordance with factors contained in the

regulations.  Id. § 416.927(d); Soc. Sec. Rul. (SSR) 96-5p, West's Soc. Sec. Reporting

Serv., Rulings 123-24 (Supp. 2012).

When the Commissioner does not give controlling weight to a treating physician's

opinion, the Commissioner will apply certain factors to determine the weight to be

accorded to all of the medical opinions.  Id. § 416.927(d).  Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at §416.927(d)(2-6); see also Goatcher v. Dep't of Health & Human Serv., 52 F.3d 288, 290 (10th Cir. 1995).

"[T]he opinion of an examining physician [(a nontreating source)][5] who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion."  Doyal v. Barnhart, 331 F.3d 758, 763 (10th Cir. 2003) (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)).  However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent v.

---

[5]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.

"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.

"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

Harris, 698 F.2d 407, 412 (10th Cir. 1983), Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

### B.    The ALJ's Evaluation of Dr. Schwartz's Opinion

The ALJ summarized and explained the weight accorded Dr. Schwartz's opinion:

The undersigned has also considered the consultative examination report from Michael H. Schwartz, Ph.D.  (Exhibit 13F [(R. 426-29)]).  Dr. Schwartz observed the claimant's form and flow of thought was sequential and understandable.  (Exhibit 13F [(R. 426-29)]).  The claimant reported to Dr. Schwartz that he feels like he can work when he takes his medications. (Exhibit 13F [(R. 426-29)]).  Dr. Schwartz opined the claimant could remember work locations and procedures as well as understand and follow simple instructions.  (Exhibit 13F [(R. 426-29)]).  However, Dr. Schwartz also speculated that the claimant would not be able to cope with the stress of a competitive work environment.  (Exhibit 13F [(R. 426-29)]).  The undersigned has considered this report and concurs the claimant is limited to simple, unskilled work, but given the minimal findings and the claimant's reported ability to work, the undersigned finds that if the claimant's interaction with others is limited to the degree described in his residual functional capacity, the claimant would be able to handle the stress of competitive employment.

As for the opinion evidence, the undersigned has considered the report from Dr. Schwartz to the extent it establishes an opinion.  Dr. Schwartz is an examining, but not a treating source and based the opinion on a one time evaluation.  Based on the minimal evaluation findings and the claimant's report that he is able to work, Dr. Schwartz [sic] statement that the claimant would not be able to handle the stress of competitive employment is not well supported.  To the extent Dr. Schwartz limits the claimant to simple, unskilled work, this limitation is given some weight.

(R. 14).

### C.    Analysis

The court finds that the ALJ's summary of Dr. Schwartz's opinion is a fair summary.  Plaintiff points to certain observations of Dr. Schwartz that were not

28

mentioned by the ALJ:  blunted and flat affect, thought content reflects a rather constricted lifestyle, had plans and goals in the past but now "is more or less accepting of his illness and feels he will have a much more limited range of possibilities in his life." (Pl. Br. 14) (quoting R. 428 and citing R. 429).  But Plaintiff does not explain why the ALJ's failure to state these specific facts renders his summary incomplete or misleading, and does not show how these facts require a different finding regarding Dr. Schwartz's opinion, or establish that Plaintiff is unable to perform simple, unskilled work or to handle the stress of competitive employment.  Basically, he argues that Dr. Schwartz is the medical expert that the Commissioner hired, and the ALJ must accept his opinion. That is not the standard to be applied, and Plaintiff provides no authority otherwise.

The ALJ accorded "some weight" to Dr. Schwartz's opinion, to the extent it "limits the claimant to simple, unskilled work," but gave four reasons for rejecting the opinion that Plaintiff cannot handle the stress of competitive employment.  (R. 14).  Dr. Schwartz is a nontreating source and his opinion is based on a one-time evaluation, Dr. Schwartz's report contains minimal findings regarding Plaintiff's ability to handle work stresses, Plaintiff reported that he can work, and Dr. Schwartz's statement that Plaintiff cannot handle work stresses is not well supported.  Id.

Plaintiff claims the ALJ erred in asserting that Dr. Schwartz believed Plaintiff capable of simple, unskilled work, because Dr. Schwartz opined only that Plaintiff "can remember work location and procedures and understand and follow simple directions." (Pl. Br. 14) (quoting R. 429).  Plaintiff's quotation, in so far as it goes, is correct.  Dr.

29

Schwartz stated his opinion regarding Plaintiff's "Potential for Competitive Employment:"  "I believe he can remember work location and procedures and understand and follow simple directions.  However, as noted, I do not believe that, because of his psychiatric symptoms, he could cope with the stress of a competitive work environment."  (R. 429).  In context, this statement supports the ALJ's understanding.  Remembering and understanding work locations and procedures, and understanding and following simple directions, are mental abilities necessary to simple, unskilled work.  Because Dr. Schwartz stated that Plaintiff has these mental abilities, but immediately thereafter expressed the opinion that Plaintiff could not handle work stresses, it is reasonable to reach the conclusion reached by the ALJ--that Dr. Schwartz was of the opinion that Plaintiff had the capability to perform simple, unskilled work, except that he would be unable to cope with the stress involved in doing work on a regular and continuing basis.

Moreover, Dr. Cohen, a state agency consultant psychologist, reviewed Dr. Schwartz's report, and reached a conclusion similar to that of the ALJ.  She gave Dr. Schwartz's opinion little weight because she found that Plaintiff said he is able to work, that Plaintiff is independent in activities of daily living, and that prior medical records do not support the limitations Dr. Schwartz assessed.  (R. 442).  She found that Plaintiff is moderately limited only in the abilities to understand, remember, and carry out detailed instructions (R. 444-45), and she concluded that he "would do best in a simple, unskilled job setting to reduce his stress level.  He is capable of learning, remembering, and performing simple job tasks at a reasonable pace.  He can concentrate and persist for

SUW [(simple, unskilled work)].  He is able to get along with the general public, peers, and supervisors."  (R. 446).  Much of Dr. Cohen's conclusion appears to be based upon an understanding of Dr. Schwartz's opinion which is consistent with the ALJ's understanding.  In his decision, the ALJ agreed with Dr. Cohen's opinion that Plaintiff is limited to simple, unskilled work, but he found that "the record also supports limitations in the ability to interact appropriately with others," and therefore accorded her opinion "little weight."  (R. 15).  Finally, the ALJ recognized that Dr. Schwartz's opinion is not absolutely clear and does not <u>require</u> a finding that Plaintiff could perform simple, unskilled work, and he qualified his finding:  "<u>To the extent</u> Dr. Schwartz limits the claimant to simple, unskilled work, this limitation is given some weight."  (R. 14) (emphasis added).  This is not error.

Plaintiff's quibble over the use of the terms "speculation," and "minimal findings" is also unavailing.  To be sure, the ALJ stated, "Dr. Schwartz also speculated that the claimant would not be able to cope with the stress of a competitive work environment," and rejected that opinion, in part, because of "minimal findings" and "minimal evaluation findings" supporting it.  (R. 14).  In fact, the ALJ's use of the term "speculation" and his rejection of the opinion because of minimal findings supporting it, are two sides of the same coin.  "Speculation" is defined as "A conclusion, opinion, or theory reached by conjecture."  The American Heritage College Dictionary 1330 (4th ed. 2002).  Further, "conjecture" is defined as an "inference or judgment based on incomplete evidence."  <u>Id.</u> at 302.  Thus, expressing an opinion based upon incomplete evidence is speculation.  The

ALJ's determination that "minimal findings" support Dr. Schwartz's opinion is substantially the same as saying that Dr. Schwartz formed the opinion based upon incomplete evidence.  Although it may have been preferable for the ALJ not to have characterized the opinion as "speculation," it was by no means reversible error.

Regarding the ALJ's determination that "minimal findings" support Dr. Schwartz's opinion that Plaintiff cannot cope with the stresses from competitive work, Plaintiff does not point to evidence or explanation in Dr. Schwartz's report which supports that opinion.  As noted above, Dr. Schwartz opined that Plaintiff's potential for competitive employment was precluded because of an inability to cope with such stresses.  (R. 429).  However, Dr. Schwartz did not explain <u>why</u> he was of that opinion or <u>what</u> <u>evidence</u> required that conclusion.  In his "Summary and Conclusion," Dr. Schwartz stated:

> The claimant is a 29-year-old, never-married, white male who has a well-established diagnosis of bipolar I disorder.  He has never lived on his own, except for a brief period fo [sic] one or two months.  He has been unable to hold down a job for longer than six months, although he states he is currently functioning okay and his medications work.  The impression he gives is of having blunted to flat affect.  I believe it would be difficult for him to cope with the stress of a competitive work environment.

(R. 429).  In this paragraph, Dr. Schwartz stated his opinion, but did not explain the basis for the opinion.  From mere proximity, one might speculate that Dr. Schwartz based his opinion on the fact that Plaintiff had "been unable to hold down a job for longer than six months, although he states he is currently functioning okay and his medications work."  However, Dr. Schwartz did not make the connection, he did not state that the past

inability to work for more than six months is because of a reaction to stress, and he did not explain how treatment in the interim, the fact that Plaintiff's medications work, or Plaintiff's current functioning would currently affect the ability to work.  Moreover, in concluding each paragraph of his "Mental Status" evaluation, Dr. Schwartz stated that Plaintiff's "thought content reflects a rather constricted lifestyle," that "[i]t may be that the main reason he is applying for disability is to be able to stay on his medications," and "he appears to be of average intelligence."  (R. 429).  On their face, none of these conclusions <u>requires</u> finding an inability to cope with work stresses, although "a rather constricted lifestyle" might provide minimal support.  Finally, although the GAF score assessed by Dr. Schwartz might be seen as consistent with the opinion regarding work stresses, Dr. Schwartz's explanation regarding the GAF score is even more lacking than his explanation regarding work stresses.  On these facts, the court is unable to find error in the ALJ's determination that there are "minimal findings" to support Dr. Schwartz's opinion that work stresses prevent competitive employment.

Plaintiff's argument that in discounting Dr. Schwartz's opinion the ALJ should not rely on Plaintiff's report of an ability to work is no more successful.  As the Commissioner points out, the argument would have more force if Plaintiff's only assertion that he is able to work was made to Dr. Schwartz, who nonetheless determined he is unable to do so.  (Comm'r Br. 18).  However, Plaintiff testified at the hearing in this case that he believed he could handle certain work (R. 31), and, as previously noted in this opinion, Plaintiff suggested to both his therapist and his physician that he could work.

(R. 387, 406, 415).  Moreover, both the therapist and the physician encouraged him in that regard.  (R. 387, 415).  Although Dr. Schwartz acknowledged Plaintiff's statement that he could work, and nonetheless determined that work stresses precluded employment, he did not, as Plaintiff's Brief suggests, express the opinion that Plaintiff's mental impairments prevent him from evaluating his own capabilities.

Finally, the court finds that the ALJ did not improperly "second guess" Dr. Schwartz, or "pick and choose" favorable parts of his report.  Although it is clear that the ALJ rejected Dr. Schwartz's opinion that Plaintiff is unable to handle work stresses, and accepted his opinion to the extent it limits Plaintiff to simple, unskilled work, this does not constitute second-guessing or picking and choosing.  As the Commissioner points out, it is the ALJ's duty to resolve conflicts in the medical evidence.  Casias, 933 F.2d at 801. Moreover, it is the ALJ's duty to weigh the medical opinions in accordance with the regulatory standard expressed above.  Doyal, 331 F.3d at 763; Goatcher, 52 F.3d at 290. Here, the ALJ did just that.  He evaluated all of the medical opinions, including Dr. Schwartz's opinion in accordance with that standard, and he expressed the weight accorded to those opinion, and the reasons for that weight.  With regard to Dr. Schwartz's opinion, he rejected the opinion that Plaintiff was precluded from work because of work stresses, and accorded weight to the opinion that Plaintiff is limited to simple, unskilled work, and stated his reasons for reaching each finding.  (R. 14).  Those reasons are supported by substantial record evidence and Plaintiff has not shown error in the analysis.

## V.    The RFC Assessment

Plaintiff claims the ALJ erred in his RFC assessment because he failed to describe functional limitations.  (Pl. Br. 8).  He notes that the "paragraph B" criteria used in assessing the severity of mental impairments at step two and step three of the sequential evaluation process are not a mental RFC assessment, and that a mental RFC assessment requires a more detailed assessment by itemizing various functions contained within the broad "paragraph B" categories.  Id. at 8-9 (citing SSR 96-8p).  He argues that the ALJ recognized this standard at steps two and three, but failed to apply it in assessing RFC, did not itemize various functions, and "failed to identify any specific functional limitations at all."  Id. at 9.

Plaintiff points to 20 C.F.R. § 404.1545(c),[6] which recognizes that mental limitations "such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work," and notes that the Commissioner has developed a "Mental Residual Functional Capacity Assessment" form which identifies twenty specific areas of mental functioning within the four broad "paragraph B" categories and provides for relative assessment of each of those areas of mental functioning.  (Pl. Br. 9-10).  He recognized that the ALJ found Plaintiff

_____

[6]Although 20 C.F.R. Part 404 applies only to the determination of SSD benefits under Title II of the Act; 20 C.F.R. § 404.1; the court recognizes that 20 C.F.R. Part 416 applies to the determination of SSI benefits under Title XVI of the Act; 20 C.F.R. § 416.101; and that 20 C.F.R. § 416.945(c) is identical in every relevant respect to the regulation cited by Plaintiff.

mentally limited to "simple, unskilled work," with "no contact with the general public and only occasional contact with co-workers or supervisors." Id. at 10.

Plaintiff argues that "simple, unskilled work" might describe a type of work, but it does not identify specific limitations in ability; that "no contact with the general public" would be a functional limitation only if interpreted to mean a "marked" limitation in mental functioning area number 12 on the Mental RFC Assessment form; and that "occasional contact with co-workers" is merely a conclusion, not a functional limitation. Id. Plaintiff suggests that "occasional contact with co-workers" should be stated in terms of mental functioning areas number 13 through 16 on the Commissioner's Mental RFC Assessment form. Id. at 10-11 (citing Hinck v. Astrue, No. Civ. A. 11-1061-JWL, 2012 WL 628250, *3 (D. Kan. Feb. 27, 2012) (the term "limitations to simple to intermediate work" is not a functional limitation because it is not defined in the ALJ's decision or in any other authority, and the court is unable to determine the precise range of work to which it refers).

The Commissioner acknowledges that RFC "must be assessed on a function-by-function basis." (Comm'r Br. 20) (citing SSR 96-8p). He argues, however that the ALJ considered the mental areas of functioning and properly assessed functional limitations supported by substantial record evidence. Id. at 20-21. He points out that it is Plaintiff's burden to demonstrate his limitations, and that Plaintiff does not suggest additional mental functional limitations which should have been included in the RFC assessed. Id.

at 22.  He argues that in the areas of mental functioning for which the ALJ included no limitation in the RFC, the court may conclude that the ALJ found no limitations.  Id.

In his Reply Brief, Plaintiff acknowledges that the limitations on contact with the public, with co-workers, and with supervisors might be interpreted as functional limitations, but argues that "[t]he same cannot be said for the limitation to 'simple, unskilled work.'" (Reply 8-9).  He argues once again that the ALJ improperly misconstrued Dr. Schwartz's finding that Plaintiff "could remember work locations and procedures as well as understand and follow simple instructions."  Id. at 9.  He argues that while a limitation to "simple repetitive tasks" is a specific functional limitation, a limitation to "simple, unskilled work" merely describes a broad category of work, and he implies that in his RFC assessment the ALJ strayed into the vocational expert's area of expertise.  Id. at 9-10 ("No need for a vocational expert if the ALJ can dictate the vocational conclusion.").  He concludes by arguing that anyone reviewing the decision "is unable to ascertain the meaning of 'simple, unskilled work.'" Id. at 10 (citing Hink).

## A.    The ALJ's Determination

In his step three discussion, the ALJ noted that Plaintiff "has a history of difficulty getting along with others at work and controlling his anger," and that he "alleges difficulty with focus and concentration."  (R. 12).  As Plaintiff pointed out, the ALJ recognized that the step two and three analysis is not an RFC assessment and that an RFC assessment requires a more detailed assessment.  Id. at 13 (citing SSR 96-8p).  He concluded, "Therefore, the following residual functional capacity assessment reflects the

degree of limitation the undersigned has found in the "paragraph B" mental functional analysis." Id.

In his RFC assessment, the ALJ found Plaintiff's allegations "not entirely credible," and he found that the treatment notes "do not support the degree of limitation alleged by the claimant." (R. 14) (emphasis added). As discussed above, the ALJ noted Dr. Schwartz's opinion that Plaintiff could remember work locations and procedures as well as understand and follow simple instructions, and accepted Dr. Schwartz's opinion "to the extent Dr. Schwartz limits the claimant to simple, unskilled work." Id. The ALJ noted that Plaintiff's mother opined that he "has a fair ability to handle stress, but has had trouble dealing with people when he has tried to work in the past," and gave these opinions some weight. (R. 15). He noted Dr. Cohen's opinion that Plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions, and he agreed with Dr. Cohen that Plaintiff was limited to simple, unskilled work, but found that the record supported additional "limitations in the ability to interact appropriately with others." (R. 15). The ALJ concluded his analysis, noting that Plaintiff "is credibly limited to simple, unskilled work and has a history of difficulty interacting with others at work. Thus, the claimant should have no contact with the general public and only occasional contact with co-workers or supervisors." (R. 15). He assessed Plaintiff's RFC, finding that he "is limited to simple, unskilled work and should have no contact with the general public and only occasional contact with co-workers or supervisors." (R. 13).

**B.**        **Standard for Assessing Mental RFC**

The Commissioner has promulgated a Psychiatric Review Technique for evaluating mental impairments at steps two and three of the sequential evaluation process. 20 C.F.R. § 416.920a.  If the Commissioner determines that plaintiff's mental impairments do not meet or equal a listing, he will then assess plaintiff's RFC.  Id. § 416.920a(d)(3).

In determining RFC, the regulations provide that the Commissioner will consider plaintiff's "ability to meet the physical, mental, sensory, and other requirements of work." Id. § 416.945(a)(4).  The regulations provide that "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [plaintiff's] ability to do [work.]"  Id. §§ 404.1545(c), 416.945(c).

The Commissioner has clarified the difference between evaluating the severity of mental limitations at steps two and three based upon the broad functional areas identified in the psychiatric review technique (the "paragraph B" criteria) and assessing mental RFC.  SSR 96-8p, West's Soc. Sec. Reporting Serv., Rulings 147 (Supp. 2012).  "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings."  Id.  RFC must be expressed in terms of specific work-related functions.  Id. at 148.  "Work-related

39

mental activities generally required by competitive, remunerative work include the abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  Id. at 149.  Therefore, an ALJ should not state a mental RFC in terms of the four functional areas, but should make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand.

### C.      Analysis

The court finds that the ALJ applied the correct legal standard to assess mental RFC, and that substantial evidence in the record supports his finding.  Contrary to Plaintiff's assertion otherwise, the mental limitations assessed by the ALJ are functional limitations, even the limitation to simple, unskilled work.  As discussed above, Dr. Cohen found that Plaintiff is moderately limited only in the abilities to understand, remember, and carry out detailed instructions (R. 444-45), and she concluded that he "would do best in a simple, unskilled job setting to reduce his stress level.  He is capable of learning, remembering, and performing simple job tasks at a reasonable pace.  He can concentrate and persist for SUW [(simple, unskilled work)].  He is able to get along with the general public, peers, and supervisors."  (R. 446).  The ALJ agreed with Dr. Cohen that Plaintiff was limited to simple, unskilled work, but found that the record supported finding him more limited in the ability to get along with the public, co-workers, and supervisors.  (R. 15).  Although the ALJ might have been more exhaustive in his description of "simple,

40

unskilled work," in light of Dr. Cohen's Psychiatric Review Technique form and Mental

RFC assessment form (R. 430-47), the ALJ's discussion of Dr. Schwartz's opinion that

Plaintiff "could remember work locations and procedures as well as understand and

follow simple instructions" (R. 14), and the ALJ's RFC analysis as summarized above,

the court finds no error.  The meaning of the term "simple, unskilled work" is not

"undefined" or unknowable in the circumstances.  In fact, Dr. Cohen found Plaintiff was

"not significantly limited" in the abilities to remember locations and work-like

procedures, and to understand, remember, and carry out very short and simple instructions

(R. 444), among others, and used the abbreviation "SUW" to describe that work.  (R.

446).

       Plaintiff's argument that the ALJ dictated the vocational conclusion by using the

term "simple, unskilled work" is also unavailing.  Every functional limitation assessed by

the ALJ requires the vocational expert (VE) to eliminate some jobs and include others

based upon his knowledge of job requirements, but that does not amount to dictating the

vocational conclusion.  A functional limitation to two hours of standing and/or walking in

a workday precludes the VE from testifying to the availability of jobs in the light

exertional base, but it does not amount to dictating the vocational conclusion when an

ALJ finds that a claimant is so limited.  It is the ALJ's duty to assess a claimant's

functional limitations, but doing so does not intrude into the area of vocational expertise.

The VE must testify as to the jobs, if any, existing in the economy which are within the

functional limitations assessed by the ALJ.  That is what happened here.

In his Reply brief, Plaintiff admitted that the limitations to "no contact with the general public and only occasional contact with co-workers or supervisors." are functional limitations.  (Reply 8-9).  Although Plaintiff asserts they are not <u>specific</u> limitations, the court finds otherwise.  <u>No contact</u>, and <u>occasional contact</u> describe specifically the amount of contact with the general public and with co-workers and supervisors, respectively that the ALJ found Plaintiff capable of handling.  No more specificity is required.  Apparently, Plaintiff expects that all mental functional limitations must be expressed in the terms used in the Mental RFC Assessment form promulgated by the Commissioner--"not significantly limited," "moderately limited," or "markedly limited."  However, he cites no authority for that proposition, and the court is aware of none.  The court finds no error in the mental functional limitations assessed by the ALJ.

Plaintiff argues that the <u>Hinck</u> case illustrates the error in failing to define "simple, unskilled work" here, and quotes a portion of that case explaining that the term "limitations to simple to intermediate work" is not a functional limitation because it is not defined in the ALJ's decision or in any other authority, and because the <u>Hinck</u> court was unable to determine the precise range of work to which it refers.  (Pl. Br. 11) (citing <u>Hinck</u>, 2012 WL 628250, at *3.  In <u>Hinck</u>, the ALJ stated that the claimant was able to perform "simple and intermediate tasks," and assessed an RFC which limited the claimant to "simple to intermediate work."  <u>Hinck</u>, 2012 WL 628250, at *5.  The court determined that on the record available there it was unable to ascertain the meaning of the limitation to "simple to intermediate work," "leaving the decision unreviewable, and necessitating

42

remand for a proper function-by-function analysis and explanation of the ALJ's findings."

Id. at *8.  Here, as discussed above, the court is able to ascertain the meaning of the

ALJ's mental RFC assessment, and remand is not necessary.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the

fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Dated this 10th day of September 2012, at Kansas City, Kansas.


s/John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**